25 A.3d 200

**Debra PARKS**

v.

**ALPHARMA, INC., et. al.**

**No. 115, Sept. Term, 2010.**

Court of Appeals of Maryland.

July 19, 2011.

Angus R. Everton (Robert C. Morgan, Carlo, Downs & Everton P.A., Hunt Valley, MD), on brief, for Appellant.

Thomas S. Williamson, Jr. (Kevin B. Collins and Lindsay B. Burke of Covington & Burling LLP, Washington, D.C.), on brief, for Appellees.

Jessica Weber, Francis D. Murnaghan, Appellate Advocacy Fellow, Public Justice Center, for Amici Curiae brief of the Public Justice Center, Maryland Employment Lawyers Association, and Metropolitan Washington Employment Lawyers Association.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

Debra Parks, the Appellant, filed a one-count complaint in the Circuit Court for Baltimore City alleging that she had been "wrongful[ly] terminat[ed] . . . in violation of public policy" from her job at Alpharma, Inc., the Appellee, a pharmaceutical company incorporated in Delaware, which had been headquartered in Bridgewater, New Jersey until being acquired in November of 2008 by King Pharmaceuticals, Inc., and is now headquartered in Bristol, Tennessee.[1] In her complaint, Ms. Parks alleged that she worked out of Alpharma's office in Baltimore, marketing prescription drugs throughout the State of Maryland, from 2001 until July of 2006, at which time she claimed to have been terminated "in retaliation for her complaints about Alpharma's illegal marketing activities." Judge Alfred Nance of the Baltimore City Circuit Court dismissed the complaint.[2]

---

**1.** In her complaint, Debra Parks named both Alpharma, Inc. and King Pharmaceuticals, Inc. as defendants. For the sake of brevity, throughout this opinion, we refer to both Alpharma, Inc. and King Pharmaceuticals, Inc., together, as "Alpharma."

**2.** Alpharma, in the Circuit Court, filed a motion captioned "Defendants' Motion to Take Judicial Notice and Supplement to Defendants' Motion to Dismiss Plaintiff's Complaint" on March 18, 2010, the day before the complaint was dismissed, to which three exhibits were attached, a copy of Ms. Parks's Second Amended Complaint in *United States ex rel. Parks v. Alpharma, Inc.*, No. AMD 06–2441 (D.Md.), a Settlement Agreement in *United States ex rel. Parks v. Alpharma, Inc.*, No. AMD 06–2441 (D.Md.), and a Press Release issued by the Department of Justice on March 16, 2010 entitled "Alpharma to Pay $42.5 Million to Resolve False Claims Act Allegations in Connection with Promotion of Drug Kadian." Judge Nance orally dismissed the case on March 19, 2010 as is reflected in the docket entries. The judge's written order, however, indicates that "upon consideration of Defendant's Motion to Dismiss (7), Plaintiff's response (7/1), review of the Court file, memoranda and arguments of the parties, it is this *19th* day of March, 2010 by the Circuit Court for Baltimore City, ORDERED, that Defendants' Motion to Dismiss is hereby GRANTED." This order, taken at face value, would have included Alpharma's Motion to Take Judicial Notice along with the external sources attached thereto, and thus, would ordinarily have converted the order of dismissal into one granting summary judgment, pursuant to Maryland Rule 2–322(c). We treat the court's order as one to dismiss Ms. Parks's complaint, however, because the judge in no way relied upon the external sources in his decision or

■ Ms. Parks noted an appeal from the circuit court's order of dismissal and raised the following issues in her briefs in the Court of Special Appeals:

1. Was it error for the trial court to grant the Motion to Dismiss this wrongful discharge action on the grounds that the Plaintiff Debra Parks failed to report Alpharma's misconduct "outside the company"?

2. Is Ms. Parks' wrongful discharge action barred because of the existence of a putative "whistleblower" remedy under the Federal False Claims Act?

In its responsive brief, Alpharma raised several grounds upon which it urged an affirmance of the trial court's dismissal of Ms. Parks's complaint against Alpharma:

I. The circuit court did not err in dismissing appellant's complaint for wrongful discharge in violation of public policy because she did not state a claim upon which relief could be granted.

A. Parks failed to identify the clear public policy mandate necessary to allege a cause of action for wrongful discharge [because:]

(1) Termination for "investigating" wrongdoing by an employer is insufficient to support a wrongful discharge claim[,]

(2) Parks has failed to identify Maryland public policy violations appropriately remedied by a wrongful termination claim[,]

(3) Parks inappropriately attempts to rest her claim on the general or universal public policy of protecting the public interest.

B. Parks has failed to allege a sufficient causal nexus between protected conduct and Alpharma's decision to terminate her.

---

discussed them during the hearing, nor did the parties refer to the external sources; both parties before us have treated the judge's order as one granting Alpharma's motion to dismiss. *See, e.g., D'Aoust v. Diamond,* 197 Md.App. 195, 205, 13 A.3d 43, 49 (2010).

C. Parks has an adequate remedy that she is currently pursuing based on the same facts and circumstances.[3]

II. The circuit court did not err in dismissing the complaint as to King, as Appellant has made no allegations against King.

■ While the appeal was pending in the intermediate appellate court, we granted certiorari, *Parks v. Alpharma, Inc.,* 417 Md. 384, 10 A.3d 199 (2010), on our own initiative, to consider whether the circuit court's grant of Alpharma's motion to dismiss was legally correct. We shall affirm the ruling of the Circuit Court dismissing Ms. Parks's complaint for failure to state a claim upon which relief can be granted, on the basis that Ms. Parks failed to identify any clear mandate of public policy allegedly violated by Alpharma and allegedly reported by her that would constitute some of the required elements of a wrongful discharge claim.[4] We, as a result, need not and will not reach any of the other issues raised.

---

3. Ms. Parks also filed suit against Alpharma pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* in the District Court for the District of Maryland, a lawsuit which was ongoing until the instant case came to oral argument, at which time the federal court granted summary judgment in favor of Alpharma. Subsequently, Alpharma filed a motion to which was appended a copy of the Federal Court's Memorandum Opinion granting summary judgment to Alpharma appended thereto, in which Alpharma requested that we take judicial notice, pursuant to Maryland Rule 5–201, of the district court's opinion. Ms. Parks promptly filed a Motion to Strike Alpharma's Line, arguing that, while the decision of the district court could come in, the findings of fact within the opinion could not. In response, Alpharma filed a reply disclaiming any intent to seek judicial notice of the facts contained in the federal court's opinion and renewed its request that we take judicial notice of the decision. Under Maryland Rule 5–201(b), we cannot take judicial notice of the opinion of the district court but will take judicial notice of the fact that summary judgment was granted to Alpharma in the suit Ms. Parks filed pursuant to the False Claims Act in the U.S. District Court for the District of Maryland, *United States ex. rel. Parks v. Alpharma Inc.,* 2011 WL 1366491, 2011 U.S. Dist. Lexis 39859 (2011).

4. Although the trial court dismissed Appellant's complaint on grounds that Ms. Parks failed to allege she reported Alpharma's misconduct externally, we shall affirm on a different basis. We can affirm the dismissal, as we said in *City of Frederick v. Pickett,* 392 Md. 411, 424, 897 A.2d 228, 235 (2006), on "any ground adequately shown by the

In her complaint, Ms. Parks alleged that, while employed with Alpharma, she was involved in marketing a prescription drug known as Kadian, which Ms. Parks represented was a "Schedule II(CII) narcotic that is a slow-release form of morphine ... approved for use in treatment of patients with chronic pain." Ms. Parks claimed that Alpharma falsely represented to physicians that Kadian could be taken in conjunction with other pain medications:

12. Chronic pain patients are usually on some other medication before they are prescribed Kadian, and thus the protocol for switching patients from another pain medicine to Kadian is a significant aspect of the process of prescribing Kadian.

13. [ ] The patient is not supposed to take both Kadian and the old drug at the same time.

\* \* \*

16. When switched to Kadian, [ ] patients frequently complained to their physician the Kadian was not working, because they felt no immediate buzz effect. Physicians reported that patients were not mollified when told that Kadian would work in 24 hours. Accordingly, patients resisted the switch to Kadian, and sales were slow.

17. To counteract this problem, Alpharma decided to falsely tell physicians that it was appropriate to jointly prescribe

---

record, whether or not relied upon by the trial court," quoting *Berman v. Karvounis*, 308 Md. 259, 263, 518 A.2d 726, 728 (1987). We noted that judicial economy was the basis for our ability to do so:

[C]onsiderations of judicial economy justify the policy of upholding a trial court decision which was correct although on a different ground than relied upon. This was explained by the Supreme Court in *Securities and Exchange Com. v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943): "It would be wasteful to send a case back to the lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."

*Id.* at 424, 897 A.2d at 236.

both Kadian and the patient's prior pain drug, while "weaning" the patient off the old drug.

\* \* \*

19. Alpharma's promotion of this means of "switching" patients to Kadian was not just off-label, but actually quite dangerous. Alpharma knew that combined use of Kadian and another opioid could lead to serious adverse events, including death.

Ms. Parks also alleged that Alpharma deliberately failed to inform the Food and Drug Administration that Kadian was potentially fatal if taken with alcohol because of an effect known as "dose-dumping": [5]

22. A common problem with time-released narcotics, such as Kadian, is "dose-dumping" (releasing too much of the painkilling component, too soon) when patients drink alcohol.

23. Kadian's FDA label, like the label for other opioids, requires physicians to warn patients not to consume alcohol when taking the drug. However, alcohol consumption is a common problem for chronic pain patients, and physicians know these patients often consume alcohol despite warnings that drinking will affect how their pain medication works. A drug's potential for "dose-dumping" is thus an important factor physicians consider when prescribing pain medication for patients at risk of alcohol abuse.

\* \* \*

27. The FDA required Alpharma to conduct clinical tests to determine whether Kadian was susceptible to "dose dumping." Within weeks of beginning its clinical testing, the results indicated that Kadian was, in fact, susceptible to

---

**5.** A "dose dump" has been defined as an "[u]nintended, rapid drug release in a short period of time of the entire amount or a significant fraction of the drug contained in a modified release dosage form[.]" Robert J. Meyer, M.D., et. al., *Awareness Topic: Reducing the Risks of Ethanol Induced Dose Dumping from Oral Sustained/Controlled Release Dosage Forms,* Oct. 2005, at 1, *available at* http://www.fda.gov/ohrms/dockets/ac/05/briefing/2005–4187B1_01_08–Alcohol–Induced.pdf.

"dose dumping" at certain strengths. Rather than reporting those results, Alpharma stopped the study.

28. Several months later, Alpharma voluntarily agreed to put a "black box" warning [6] on its Kadian label, but never told the FDA about the "dose dumping" problem the study's early results has indicated.

29. During the period when Alpharma was supposedly conducting its clinical study, Alpharma directed its sales representatives to promote Kadian by highlighting the fact that Kadian was the only time-released opium-based pain reliever of its type that had no "black box" warning, even though Alpharma had no evidence to support the notion that Kadian was not susceptible to "dose dumping."

In her complaint, Ms. Parks further alleged that she reported her concerns to named individuals at Alpharma:

33. Parks, in an e-mail to Alpharma sales manager Michael Slesinksi, and on other occasions, conveyed her concern that she felt uncomfortable with this conversion method and was worried about the sales representatives confusion over the method.

\* \* \*

46. Parks, on August 24, 2005, at a company conference in Atlanta, spoke to Dr. Ron Warner, then Vice President of Alpharma. Parks informed Dr. Warner of Angie Miliman's patient and told him that she hoped if Alpharma became aware of Kadian "dose-dumping," Alpharma would disclose that information as soon as possible, because her physicians relied on her to tell them the truth. Parks told Dr. Warner that she would feel complicit in any delay because of an effort to gain a market advantage.

---

**6.** The Food and Drug Administration has defined "black box" warning as one "[included on a] prescription drug's label[, which is] designed to call attention to serious or life-threatening risks." U.S. Food and Drug Administration, FDA Consumer Health Information: A Guide to Drug Safety Terms at FDA, at 2 (Apr. 11, 2008), *available at* http://www.fda.gov/downloads/ForConsumers/ConsumerUpdates/ucm107976.pdf.

47. On November 18, 2005, Parks spoke to Dr. Joseph Stauffer, Director of Medical Affairs for Alpharma, and Dr. George Wagner about the alcohol studies with Kadian. . . .

48. In December, 2005, Parks spoke at length with sales manager Michael Slesinski about the Kadian alcohol studies. Parks conveyed that she was worried about Kadian patients and told him about Angie Miliman's patient that had died. . . .

49. In January, 2006, Parks called Eric Vandal, Director of Marketing for Alpharma. Parks told Eric Vandal that George Bhailey, the Oromorph sales representative for Xanodyne, was telling physicians that Kadian did "dose-dump" when consumed with alcohol.

\* \* \*

51. [ ] Parks spoke to Craig Lafay, Senior Sales Manager for Alpharma, and told him that she hoped Alpharma was taking the alcohol study seriously, as the physicians she called on wrote high amounts of Kadian. . . .

52. Parks and her manager, Peter Hill, spoke about the "dose-dumping" issue on every field ride together. . . .

53. In April of 2006, Parks had dinner with James Meade, Regional Managed Markets Representative for Alpharma. . . . Parks conveyed to James Meade that she was horrified that Alpharma was manipulating the results of the Kadian alcohol study, instead of disclosing the results to the FDA, and was worried that someone would die.

Ms. Parks further claimed that, after she had raised her concerns with various people at Alpharma, that Alpharma "retaliated against her" by terminating her employment in July of 2006.

Ms. Parks, in attempting to establish one of the bases for a wrongful discharge claim, asserted that Alpharma had breached various duties established by state and federal statutes, the first of which, Ms. Parks claimed, was Alpharma's duty to place warnings on the Kadian prescription drug bottle pursuant to a federal regulation addressing hazardous side effects:

80. Alpharma wrongfully terminated Parks in violation of the public policy set forth in 21 C.F.R. § 201.57(c)(6)(i), which states that a prescription drug label must "be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(6)(i).

81. There is no civil remedy available to Parks for Alpharma's violation of 21 C.F.R. § 201.57(c)(6)(i).

Ms. Parks next averred that Alpharma violated its duty to refrain from engaging in "unfair or deceptive acts or practices" pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), when it allegedly sought to mislead physicians about the safety of taking Kadian along with alcohol or other prescription painkillers:

82. Alpharma wrongfully terminated Parks in violation of the public policy set forth in the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1).

83. There is no civil remedy available to Parks for Alpharma's violation of 15 U.S.C. § 45(a)(1).

Ms. Parks further alleged that Alpharma violated its duty to refrain from engaging in "unfair or deceptive trade practices" pursuant to the Maryland Consumer Protection Act, Maryland Code (1975, 2005 Repl.Vol.), Sections 13–101 through 13–501 of the Commercial Law Article, likewise when it allegedly sought to mislead physicians about the safety of taking Kadian in conjunction with alcohol or other prescription painkillers:

84. Alpharma wrongfully terminated Parks in violation of the public policy set forth in Maryland's Consumer Protection Act, which prohibits unfair or deceptive trade practices, including any: "(1) False ... or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; (2) Representation that: (i) Consumer goods ... or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit,

or quantity which they do not have.... (3) Failure to state a material fact if the failure deceives or tends to deceive.... (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods ... or consumer service[.]" MD Code, CL § 13–301.

85. Under the Consumer Protection Act: "A person may not engage in any unfair or deceptive trade practice ... in: (1) The sale ... of any consumer goods ... or consumer services; (2) The offer for sale ... or consumer services[.] MD Code, CL § 13–303.

86. Any practice prohibited by the Consumer Protection Act is a violation of the Act, "whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." MD Code, CL § 13–302.

87. There is no civil remedy available to Parks for Alpharma's violation of Maryland's Consumer Protection Act.

Ms. Parks claimed that Alpharma fired her in retaliation for her having investigated and reported Alpharma's alleged noncompliance with the three laws:

91. Parks, on numerous occasions and to multiple agents of Alpharma, expressed her concerns about the Kadian conversion method and her concerns that Alpharma had discovered evidence that Kadian was susceptible to "dose-dumping."

\* \* \*

93. Parks was terminated because of her imminent disclosure of Alpharma's dangerous practices.

94. Alpharma's knowledge of its illegal practices is evidenced by the fact that it did not try to bring its practices into compliance after Parks pointed out the illegal conduct. Instead, Alpharma retaliated against Parks and ultimately fired her.

Thereafter, Alpharma filed a motion to dismiss Ms. Parks's complaint for failure to state a claim upon which relief could be granted, arguing that Ms. Parks had failed to identify a

clear mandate of public policy that Alpharma violated about which she was subsequently terminated for reporting, that she had failed to plead the required causal nexus between the applicable public policy mandate and the reason for her termination, that Ms. Parks already had a statutory remedy available under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and that Ms. Parks had not alleged any wrongdoing by King Pharmaceuticals, Inc., though she had named King in her complaint. After a hearing on March 19, 2010, Judge Nance granted Alpharma's motion to dismiss on the basis that Ms. Parks had not alleged that she had reported Alpharma's misconduct to an external source in accordance with our decision in *Wholey v. Sears*, 370 Md. 38, 803 A.2d 482 (2002):

> *Wholey* says to this court that there must be a reporting of the wrongdoing to someone outside of the company. And that third party report, if you will, becomes a necessary condition for the protection. . . .

On appeal from a dismissal for failure to state a claim, we "must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted." *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643, 994 A.2d 430, 433–434 (2010) (citations omitted). We must confine our review of "the universe of 'facts' pertinent to the court's analysis of the motion" to "the four corners of the complaint and its incorporated supporting exhibits, if any." *Id.*, 994 A.2d at 434. "The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Id.* at 644, 994 A.2d at 434. Our goal, in reviewing the trial court's grant of dismissal, is to "determine whether the court was legally correct." *Id.*

Ms. Parks has argued that, though her employment with Alpharma was "at will," she was fired as a result of having reported Alpharma's alleged violations of clearly defined mandates of public policy, thereby giving her a common law cause of action for wrongful discharge. Among many other responses, Alpharma has countered that Ms. Parks failed to identify any clear mandate of public policy in her complaint that Alpharma allegedly violated that she allegedly reported, in order to state a claim upon which relief could be granted, the only issue with which we are concerned in this appeal.

█ The employment at will doctrine provides that, "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time" without giving rise to a cause of action for breach of contract. *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). The doctrine has its roots in the "freedom to contract or to engage in a business enterprise." *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069, 1073 (1991); *McCullough Iron Co. v. Carpenter*, 67 Md. 554, 557, 11 A. 176, 178 (1887). The ability of employers to summarily terminate the employment at will relationship, initially, was a force that could not be reckoned with, but, in the wake of The Great Depression, and the soon-to-follow New Deal, Congress began imposing statutory limits upon employers' abilities to terminate employees, for instance, the National Labor Relations Act, 29 U.S.C. §§ 151–169, which encouraged collective bargaining, and the Fair Labor Standards Act, 29 U.S.C. §§ 201–219, which set a national minimum wage, prohibited child labor, and required a higher rate of overtime pay. Mark A. Rothstein, et. al., Employment Law, at 2–3 (4th ed. 2009). Maryland, as well as other states, began "engraft[ing] exceptions upon the terminable at will doctrine that abrogate[d] an employer's absolute right to discharge an at will employee for any or no reason," such as Maryland's statutory prohibition on firing an employee "because of . . . race, color, religion, sex, age, national origin, marital status, or physical or mental handicap. . . ." *Adler*, 291 Md. at 35, 432 A.2d at 467, quoting Maryland Code (1957, 1979 Repl.Vol.), Article 49B,

Section 16(a)(1). In the latter-quarter of the twentieth century, many state supreme courts also began addressing the viability of wrongful discharge suits. Maryland, in *Adler*, 291 Md. at 31, 432 A.2d at 464, was one of them.

In *Adler*, 291 Md. at 31, 432 A.2d at 464, we recognized that any decision to adopt a limit on the employment at will doctrine, or in any way modify it, necessarily involved the consideration of several competing interests, that of employers to manage their business as they see fit, that of an employee to seek job security without being fired for "refus[ing] to act in an unlawful manner or attempt[ing] to perform a statutorily prescribed duty," and that of society at large to ensure its public policies are upheld:

> When terminated without notice, an employee is suddenly faced with an uncertain job future and the difficult prospect of meeting continuing economic obligations. But this circumstance, of itself, hardly warrants adoption of a rule that would forbid termination of at will employees whenever the termination appeared "wrongful" to a court or a jury. On the other hand, an at will employee's interest in job security, particularly when continued employment is threatened not by genuine dissatisfaction with job performance but because the employee has refused to act in an unlawful manner or attempted to perform a statutorily prescribed duty, is deserving of recognition. Equally to be considered is that the employer has an important interest in being able to discharge an at will employee whenever it would be beneficial to his business. Finally, society as a whole has an interest in ensuring that its laws and important public policies are not contravened.

*Adler*, 291 Md. at 42, 432 A.2d at 470.

In enabling the tort of wrongful discharge, we emphasized the fulcrum between a wrongful discharge and a legally permissible one is affected by whether the public policy allegedly contravened by the employer is "sufficiently clear":

> [F]ew courts have flatly rejected the notion that the wrongful discharge of an at will employee may give rise to a cause

of action for damages. Where courts differ is in determining where the line is to be drawn that separates a wrongful from a legally permissible discharge. This determination depends in large part on whether the public policy allegedly violated is *sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.*

*Id.* at 42, 432 A.2d at 470–471 (emphasis added). We, likewise, limited the availability of the wrongful discharge tort to terminations which contravened some "declared mandate of public policy," emphasizing that we would recognize otherwise undeclared public policy "only with the utmost circumspection":

[T]he Court has not confined itself to legislative enactments, prior judicial decisions or administrative regulations when determining the public policy of this State. We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch. We have been consistently reluctant, for example, to strike down voluntary contractual arrangements on public policy grounds. As Mr. Justice Sutherland stated for the Supreme Court in *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930): "The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another."

*Id.* at 45–46, 432 A.2d at 472 (citations omitted).

Since recognizing the tort of wrongful discharge in *Adler*, the tort itself has been refined on a case by case basis. The Court of Special Appeals had occasion to address the situation in which an employee has a specific legal duty, where nonexercise would be a breach of that duty and the employee is

discharged for performing that duty in *Bleich v. Florence Crittenton Serv.*, 98 Md.App. 123, 632 A.2d 463 (1993). In *Bleich*, the issue presented was whether a teacher stated a claim for wrongful discharge where her employment with a child care provider had been terminated for reporting incidents of suspected child abuse. Pursuant to Maryland Code (1984, 1991 Repl.Vol.), Section 5–704(a) of the Family Law Article, Ms. Bleich was a "mandatory reporter," or an individual with a specific legal duty to report any suspected child abuse or neglect to a supervisor:

> (a) [E]ach health practitioner, police officer, or educator or human service worker, acting in a professional capacity, who has reason to believe that a child has been subjected to:
> (1)(i) abuse, shall notify the local department or the appropriate law enforcement agency; or
> (ii) neglect, shall notify the local department; and
> (2) if acting as a staff member of a hospital, public health agency, child care institution, juvenile detention center, school, or similar institution, immediately notify and give all information required by this section to the head of the institution or the designee of the head.

*Id.* at 136, 632 A.2d at 469. The statute, therefore, delineated a specific legal duty owed by Ms. Bleich, for which she should not have been terminated for her observance. *Cf. Milton v. IIT Research Institute*, 138 F.3d 519, 523 (4th Cir.1998) ("Milton labored under no 'specific legal duty' ... to report IITRI's tax fraud to the Board. He points to no statute or other legal source that imposes on him a specific duty to report, and the broad fiduciary obligations of 'care and loyalty' he alleges are simply too general to qualify as a specific legal duty that will support the claim that his discharge violates a 'clear mandate of public policy.' ")

■ Employees terminated for refusing to engage in criminal conduct also may be able to avail themselves of the tort of wrongful discharge. For instance, in *Insignia Residential Corp. v. Ashton*, 359 Md. 560, 755 A.2d 1080 (2000), an assistant property manager claimed that she had been fired

after refusing to engage in sexual intercourse with one of Insignia's employees, which we determined was sufficient to state a claim for wrongful discharge, based upon the clear public policy of the State prohibiting prostitution.[7]

As an employee may not be forced to violate a statutory duty or engage in conduct that violates public policy, so too an employer cannot fire an employee because of the exercise of a legal right, as we recognized in *Ewing v. Koppers Co. Inc.*, 312 Md. 45, 537 A.2d 1173 (1988), regarding the filing of a worker's compensation claim, or risks being sued for wrongful discharge. Nor, for that matter, can an employer escape suit for wrongful discharge should he or she fire an employee who sought legal redress against a co-worker who assaulted her. *Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991).

We also have recognized that an employer who deficiently performs a specific legal duty may have liability for wrongful discharge if the basis for terminating the employee was the

---

7. The effect of alternative statutory remedies was the thrust of *Insignia Residential Corp. v. Ashton*, 359 Md. 560, 755 A.2d 1080 (2000), however, and we noted that:

> In *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981), we confirmed the long-standing common law rule that "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." We also held, however, that that common law rule is subject to modification both by statute and by judicial decision, and we recognized in *Adler* that a cause of action in tort may lie for the "abusive discharge" of an at will employee "when the motivation for the discharge contravenes some clear mandate of public policy." In *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989), we added the caveat that an action for abusive discharge will *not* lie when the public policy violated by the discharge arises from a statute that provides its own remedy for the violation. A separate tort action, we said, was unnecessary in such a situation. In *Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991), we noted that there may be multiple sources of public policy and held that when, in such an instance, at least one public policy mandate violated by a discharge does not arise from a law that provides its own remedy for the violation, an action for abusive discharge based on *that* violation may lie.

*Insignia Residential Corp.*, 359 Md. at 561–562, 755 A.2d at 1080–1081.

latter's reporting the employer's failure to perform that specific legal duty, as we discussed in *Adler*, 291 Md. at 42–45, 432 A.2d at 470–472. It is this category of wrongful discharge claim within which Ms. Parks seeks succor.

In *Adler*, a discharged corporate employee asserted that he was fired from his position as an Assistant General Manager of American Standard Corporation for discovering and reporting "numerous improper and possibly illegal practices" to various corporate officers, including "[a]ttempts to treat capital expenditures as expenses," "[p]ayment of commercial bribes," "[f]alsification of sales and income information, and alteration of commercial documents to support the falsified information," "[m]isuse of corporate funds by officers for their personal benefit," "[m]anipulation of work-in-process inventory information," and "[a]lteration of forecasts in connection with intra-corporate financial reporting." *Adler*, 291 Md. at 33, 432 A.2d at 466. In his complaint, Mr. Adler alleged that American Standard Corporation had been violating a legal duty manifest in our corporate fraud law, which generally forbade corporate officers and agents from engaging in fraudulent activities relating to their corporate duties:

> [It shall be a misdemeanor for] any officer or agent of any corporation fraudulently [to] sign, or in any ·other manner assent to any statement or publication, either for the public or the shareholders thereof, containing untruthful reporting representations of its affairs, assets or liabilities with a view either to enhance or depress the market value of the shares therein, or the value of its corporate obligations, or in any other manner to accomplish any fraud thereby. . . .

Maryland Code (1957, 1976 Repl.Vol.), Article 27, Section 174, quoted in *Adler*, 291 Md. at 44, 432 A.2d at 471. Despite Mr. Adler's claim that the corporate malfeasance he alleged was "so clearly against public policy that he need not identify any statute or rule of law specifically prohibiting such improper and possibly illegal practices," we determined that he had failed to identify a specific legal duty owed by his employer. *Id.* at 43, 432 A.2d at 471. In so doing, we explained that the corporate fraud statute did not by itself inform as to what

specific behavior American Standard was legally bound to perform, or refrain from performing. Rather, we rejected the complaint in words that were prescient in the instant matter:

> Accepting the averments of Adler's complaint as true, we think they are too general, too conclusory, too vague and lacking in specifics to mount up to a prima facie showing that the claimed misconduct contravened § 174 and hence violated the public policy of this State. Adler's complaint does not assert that the falsification of corporate records was done with an intent to defraud either stockholders or the public at large by enhancing or depressing the market value of the Corporation's shares or other obligations. As a result, the allegations of the complaint do not set forth a violation of the conduct proscribed by § 174. Indeed, during oral argument of the case before us, Adler's counsel was asked whether his complaint was intended to allege the commission of a crime. In response, he stated that he could not say one way or the other whether the claimed misconduct constituted a crime.

*Id.* at 44, 432 A.2d at 471.

Subsequently, in *Wholey*, 370 Md. at 38, 803 A.2d at 482, we considered whether a whistleblower claim existed when an employee alleged that he reported to his employer that a co-worker was engaging in criminal activity. Specifically, a department store security guard alleged that he was discharged after investigating and reporting his suspicions that a store manager was a thief. We delineated various limitations on a court's ability to articulate a new public policy mandate, those being:

> The first limiting factor with respect to adopting a "new" public policy mandate for a wrongful discharge claim is derived from the generally accepted *purpose* behind recognizing the tort in the first place: to provide a remedy for an otherwise unremedied violation of policy. . . . A second limiting factor in defining a public policy mandate as a cause of action in tort is the notion that the policies should be reasonably discernible from prescribed constitutional or statutory mandates.

*Id.* at 52–53, 803 A.2d at 490–491. We spent considerable time exploring what the public policy exception to the at will employment doctrine meant and noted:

> In exercising our measured authority to define public policy ... we must strive to confine the scope of public policy mandates to clear and articulable principles of law and to be precise about the contours of actionable public policy mandates.

*Id.* at 52, 803 A.2d at 490. In applying these limitations in *Wholey,* we did determine that, "the Legislature had created a cognizable statutory interest in the ability to report crimes or testify at an official proceeding without fear of retaliation" sufficient to sustain a wrongful discharge claim, but only if the employee had reported to an appropriate law enforcement or judicial officer. *Id.* at 59–61, 803 A.2d at 494–95.

In *Lark v. Montgomery Hospice,* 414 Md. 215, 994 A.2d 968 (2010), we addressed the complaint of a resident nurse who alleged she was terminated after reporting various failures of her employer to observe health standards pursuant to the Health Care Worker Whistleblower Protection Act, Maryland Code (2000), Sections 1–501 through 1–506 of the Health Occupations Article. We determined that the Act imposed a specific legal duty upon healthcare employers "to correct violations that endanger the health and safety of patients to whom that employer owes a duty of care," *Id.* at 243, 994 A.2d at 984, and specifically protected "licensed or certified" healthcare employees that reported violations of this duty:

> [A]n employer may not take or refuse to take any personnel action as reprisal against an employee because the employee:
>
> (1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation;
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by the employer; or

(3) Objects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation. *Id.* at 229–30, 994 A.2d at 976–77. The whistleblower protections afforded to healthcare employees who made the reports were explicitly articulated by the Legislature, in a detailed manner, dictating the quality of information the report must be premised upon and in what way the report must be made:

The protection provided against a violation of § 1–502 of this subtitle shall only apply if:

(1) The employee has a reasonable, good faith belief that the employer has, or still is, engaged in an activity, policy, or practice that is in violation of a law, rule, or regulation;

(2) The employer's activity, policy, or practice that is the subject of the employee's disclosure poses a substantial and specific danger to the public health or safety; and

(3) Before reporting to the board:

(i) The employee has reported the activity, policy, or practice to a supervisor or administrator of the employer in writing and afforded the employer a reasonable opportunity to correct the activity, policy, or practice; or

(ii) If the employer has a corporate compliance plan specifying who to notify of an alleged violation of a rule, law, or regulation, the employee has followed the plan.

*Id.* at 230, 994 A.2d at 977. Our decision revolved around the scope of whistleblower protections provided to Ms. Lark pursuant to the Act in question.

 In the present case, Ms. Parks attempts to bring herself within the *Lark* rationale by alleging that she was fired solely because she reported that Alpharma was engaging in "unlawful acts that [would] work a detriment to the public at large or to a third person," in violation of the Maryland Consumer Protection Act, Maryland Code (1975, 2005 Repl. Vol.), Sections 13–101 through 13–501 of the Commercial Law Article, the Federal Trade Commission Act, 15 U.S.C. § 45 (2006), and the FDA's regulation of the labeling of prescription drugs with hazardous side effects, 21 C.F.R. § 201.57.[8]

---

**8.** To the extent that Ms. Parks has argued that cases from other jurisdictions and the Federal District Court for the District of Maryland

Alpharma counters that the three sources of public policy upon which Ms. Parks bases her wrongful discharge claim impose no specific legal duty upon Alpharma, either to act, or refrain from acting, in the manner Ms. Parks has alleged, and thus, her claim falls short of espousing a clear mandate of public policy.

Ms. Parks initially premises her claim of a public policy mandate to which Alpharma was mandated to adhere upon the Maryland Consumer Protection Act, Maryland Code (1975, 2005 Repl.Vol.), Section 13–303 of the Commercial Law Article, which provides:

A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:

(1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;

(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;

(3) The extension of consumer credit; or

(4) The collection of consumer debts.

The Act goes on to provide that "[a]ny practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." Maryland Code (1975, 2005 Repl. Vol.), Section 13–302 of the Commercial Law Article. An "unfair or deceptive trade practice," is defined in pertinent part, as follows:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any

---

support her claims that internal reports of employer misconduct are sufficient to constitute a wrongful discharge claim, or that adequate alternative remedies do not preclude her wrongful discharge claim in the instant case, we are not addressing those claims, nor the cases cited therein, for we affirm the circuit court's dismissal solely on the ground that Ms. Parks failed to identify a specific legal duty that Alpharma was bound to perform, that it allegedly did not perform, and that Ms. Parks was allegedly fired for reporting.

kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

\* \* \*

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service. . . .

Maryland Code (1975, 2005 Repl.Vol.), Section 13–301 of the Commercial Law Article. We have repeatedly stated that the Legislature, in enacting the Consumer Protection Act, vested the Consumer Protection Division with exceptionally broad powers to interpret and enforce the statute, including

the power to receive and investigate consumer complaints, initiate its own investigation of any possibly unfair and deceptive trade practices, issue cease and desist orders, adopt rules and regulations which further define unfair or deceptive trade practices or otherwise effectuate the purposes of the Act, and seek a temporary or permanent injunction in a civil enforcement proceeding. The statute further provides that the Division may "exercise and perform any other function, power and duty appropriate to protect and promote the welfare of consumers."

*Consumer Protection v. George,* 383 Md. 505, 513–14, 860 A.2d 896, 901 (2004) (citations omitted). The Act also provides a private civil remedy for consumers that can establish that they suffered "actual injury or loss." *Citaramanis v. Hallowell,* 328 Md. 142, 151–153, 613 A.2d 964, 968–69 (1992).

The Consumer Protection Act, however, does not provide the specificity of public policy that we have required to support a wrongful discharge claim. The extent of the public policy mandate contained in the Act supports the breadth of

its enforcement, but undermines its utility in the context of a wrongful discharge claim, for, as said in *Wholey,* "policies should be reasonably discernible from prescribed constitutional or statutory mandates," to ensure that our decisions to extend the tort of wrongful discharge emanate solely from "clear and articulable principles of law." 370 Md. at 52–53, 803 A.2d at 490–91.

Similarly, Ms. Parks's reliance on the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce," as a basis for her wrongful discharge claim, falls short of providing the unmistakably clear mandate of public policy that we have required in our jurisprudence. The FTCA itself is cast in even more general terms than the Consumer Protection Act, defining "unfair or deceptive acts or practices" as those that "cause or are likely to cause reasonably foreseeable injury within the United States," or "involve material conduct occurring within the United States." 15 U.S.C. § 45(a)(4). To administer the FTCA, Congress vested broad authority in the Federal Trade Commission to bring enforcement actions

> to prevent persons, partnerships, or corporations, except banks, savings and loan institutions ... Federal credit unions ... common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers ... and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended ... from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

15 U.S.C. § 45(a)(2). In fact, with few limitations, it is uniquely within the power of the FTC to determine whether an act or practice is unfair, so long as it

> causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public

policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

15 U.S.C. § 45(n). Again, the extensiveness of the Federal Trade Commission Act undermines its utility as a basis for a wrongful discharge claim, because a specific public policy mandate is not discernible. Rather, we are left with Ms. Parks's naked allegation that Alpharma was violating the Federal Trade Commission Act, a claim identical to that rejected in *Adler*, being far "too general, too conclusory, too vague, and lacking in specifics" to establish that Alpharma contravened a clear mandate of public policy. 291 Md. at 44, 432 A.2d at 471.

Ms. Parks also has claimed that, because the Food and Drug Administration's prescription drug labeling regulations provide a standard for labeling prescription drugs that pose certain health risks, as found in 21 C.F.R. § 201.57(c)(6)(i), Alpharma violated a legal duty by failing to include such a warning on Kadian until 2005, after Alpharma had begun marketing the drug. The FDA labeling regulation that Ms. Parks relies upon in her complaint provides. in pertinent part:

*General.* This section must describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards (including those that are expected for the pharmacological class or those resulting from drug/drug interactions), limitations in use imposed by them (e.g., avoiding certain concomitant therapy), and steps that should be taken if they occur (e.g., dosage modification). The frequency of all clinically significant adverse reactions and the approximate mortality and morbidity rates for patients experiencing the reaction, if known and necessary for the safe and effective use of the drug, must be expressed.... In accordance with §§ 314.70 and 601.12 of this chapter, the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable

evidence of a causal association with a drug; a causal relationship need not have been definitely established.

21 C.F.R. § 201.57(c)(6)(i). The FDA enforces its labeling requirements through a recall procedure or by the initiation of civil or criminal proceedings. 21 C.F.R. §§ 7.1 *et seq.*

The regulation at issue provides the FDA's standard for what details must be included on a prescription drug label if there is "reasonable evidence" that a particular drug has a "clinically significant hazard." What is not clear from the regulation is the specific public policy mandate that Alpharma allegedly violated to support the instant wrongful discharge claim. Under such circumstances, we are left with only our own discernment to determine whether the behavior Ms. Parks's alleges constituted non-compliance by Alpharma, a judgment we abjure, absent a clear, unmistakable signal in the law.

We find helpful, in this regard, a discussion rendered by the Fourth Circuit Court of Appeals in a wrongful discharge case grounded in FDA regulations. In *Szaller v. American National Red Cross*, 293 F.3d 148 (4th Cir.2002), a Red Cross employee filed a wrongful discharge claim after allegedly being fired for reporting to a Red Cross hotline his suspicions that his co-workers and supervisors were engaging in "various blood handling and staff training deficiencies." *Id.* at 150. Mr. Szaller based his wrongful discharge claim on FDA's regulations describing the standard for collecting and storing human blood. In rejecting the claim, the Fourth Circuit explained that it could not announce, based on Mr. Szaller's judgment, or even that of its own, which of the FDA's regulations bound the Red Cross to a specific legal duty and which did not:

[If a court] were to announce that [the FDA's regulations] were all sources of Maryland public policy, an employee could immunize himself against adverse employment action simply by reporting an alleged violation of any regulation. And the narrow wrongful discharge exception, carefully carved out by the Maryland courts, would then supplant the

general at will employment rule.... Szaller [is] unable to give any meaningful guidance about which regulations would qualify as Maryland public policy and which ones would not, or how a court would even begin to determine which ones were "important" enough to support a wrongful discharge action. Szaller urges that we simply use "good judgment" to draw the line between various regulations, or write a narrow decision for this case only. But all federal regulations address areas of public concern, and a litigant could argue that all federal policies protect cogent and compelling interests.

*Szaller*, 293 F.3d at 152. In the case before us, Ms. Parks has presented this Court with a dilemma along the same lines, for, if we were to recognize a mandate in the FDA's labeling standard, we are at a loss for articulating precisely what the contours of that mandate would be.

For all of the reasons stated, we conclude that Ms. Parks has failed to state a claim upon which relief can be granted for wrongful discharge, and therefore, affirm the decision of the Circuit Court. The public policy that Ms. Parks alleged Alpharma violated was not sufficiently clear to provide the basis for her wrongful discharge claim.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

ADKINS, J., concurs.

ADKINS, J., Concurring.

Most respectfully, I agree with the conclusion reached by the majority, and join in the judgment, but write separately to make two points.

First, the majority says that "[a]lthough the trial court dismissed Appellant's complaint on grounds that [ ] Parks failed to allege she reported Alpharma's misconduct externally, we shall affirm on a different basis." Maj. Op. 65, 25 A.3d at 203 n. 4. In doing so, the majority leaves in a state of doubt

the law regarding whether a whistleblower action requires external reporting. We resolved this issue in favor of internal reporting in *Lark v. Montgomery Hospice, Inc.*, 414 Md. 215, 994 A.2d 968 (2010), in which we held that a nurse who alleged she was terminated after reporting to her supervisor the failures of her employer to observe health standards, stated a cause of action for wrongful discharge.

Although *Lark* involved the Health Care Worker Whistleblower Protection Act, which contained specific provisions about notice to the employer that are not applicable here, the Court rejected the employer's argument that Lark was required to report the wrongful actions to external authorities on broad grounds applicable to many types of employers. Writing for the Court, Judge Joseph Murphy explained its rationale by adopting commentary from a treatise on wrongful discharge:

> Although it would clearly seem to be in employers' interest to encourage employees to report violations internally before (or instead of) making reports to governmental authorities, a number of courts that have addressed the issue have held that the public policy tort doctrine does not protect a whistleblower from retaliation unless he or she has gone outside the company with reports of wrongdoing.
>
> The majority (and better) view, however, is that internal protests are enough, and that the viability of a public policy tort claim by a discharged whistleblower does not depend on whether or not the violations or illegal activities were reported to outside authorities.

*Id.* at 232, 994 A.2d at 978 (quoting Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 5.13 (1987 & Supp.2009–10)).

The *Lark* Court then quoted with approval from a Connecticut case applying Massachusetts law:

> ... **A rule that would permit the employer to fire a whistleblower with impunity before the employee contacted the authorities would encourage employers promptly to discharge employees who bring complaints to their attention, and would give employees with com-**

**plaints an incentive to bypass management and go directly to the authorities.** This would deprive management of the opportunity to correct oversights straightaway, solve the problem by disciplining errant employees, or clear up a misunderstanding on the part of a whistleblower. The likely result of a contrary rule would be needless public investigations of matters best addressed internally in the first instance. Employers benefit from a system in which the employee reports suspected violations to the employer first; the employee should not, in any event, be penalized for bestowing that benefit on the employer.

*Lark,* 414 Md. at 236, 994 A.2d at 980–81 (quoting *Sullivan v. Massachusetts Mut. Life Ins. Co.,* 802 F.Supp. 716, 724–25 (D.Conn.1992) (emphasis in original)). In concluding, Judge Murphy said:

Moreover, if an employer (1) corrects the activity that created a substantial danger, and (2) terminates the employment of the "meddlesome" employee who reported the problem that has been corrected, it would make no sense to impose an external report requirement that would accomplish nothing other than a drain upon the scarce resources of the appropriate board.

*Id.* at 242, 994 A.2d at 984. Based on our decision in *Lark,* and on the many persuasive authorities cited in that case, *see id.* at 231–243, 994 A.2d at 977–84, I would expressly reject the ruling of the trial court in this case that Parks loses because she did not make a report outside of the company.

My second concern is sparked by the majority's reliance on a Fourth Circuit case, *Szaller v. The Am. Nat'l Red Cross,* 293 F.3d 148 (4th Cir.2002), a decision I think is poorly reasoned. Although the passage from *Szaller* quoted by the majority is perhaps, innocuous, other strong language in *Szaller* is, in my view, decidedly wide of the mark. I fear repercussions from the stamp of approval given the case by the majority:

Szaller argues that the Red Cross violated a clear mandate of public policy by discharging him for reporting allegedly improper blood handling procedures to a Red Cross hotline.

We disagree. Szaller cannot point to a single mandate of Maryland public policy that his termination contravened. **He relies solely on FDA regulations and a consent decree between the FDA and the Red Cross to support his wrongful discharge claim. Maryland courts, however, have given no indication that federal regulations or consent decrees constitute Maryland public policy.** And absent any suggestion that Maryland would recognize a claim for wrongful discharge in the circumstances presented by Szaller's termination, we cannot conclude otherwise and extend state law through judicial conjecture.

Szaller simply cannot rely on federal regulations as a mandate of Maryland public policy. Although federal law can preempt state law under the Supremacy Clause, this in no way implies that federal law automatically defines state policy, or that federal agencies can determine its parameters. Perhaps the regulations and consent decree provisions Szaller points to in his proposed second amended complaint would constitute clear mandates of federal policy. But federal policy is enforced by the means Congress specifies, not through state-law wrongful discharge actions.

*Szaller*, 293 F.3d at 151 (emphasis added).

The Fourth Circuit continued its tirade against reliance on federal regulations in wrongful discharge cases:

In an attempt to address the overwhelming burden his position would place on Maryland employers, Szaller contended at oral argument that only federal regulations dealing with situations of "extreme importance" should be included in the state's public policy. Szaller further argued that the FDA regulations at issue here, addressing the proper collection of blood, are of such importance. Yet Szaller was unable to give any meaningful guidance about which regulations would qualify as Maryland public policy and which ones would not, or how a court would even begin to determine which ones were "important" enough to support a wrongful discharge action. Szaller urges that we simply use "good judgment" to draw the line between various regulations, or write a narrow decision for this case

only. But all federal regulations address areas of public concern, and a litigant could argue that all federal policies protect cogent and compelling interests. If the Maryland courts or legislature wish to define which federal regulations also qualify as clear mandates of state public policy, they are free to do so. But federal courts cannot draw the line for Maryland.

*Szaller* at 152. The Fourth Circuit surely underestimates our skill in separating the wheat from the chaff. It is by no means beyond the ken of this Court to assess the relative importance of one Federal regulation over another in terms of wrongful discharge law.

I would reject all of the above language from *Szaller* out of hand, and make clear that when addressing wrongful discharge cases in Maryland, or when Federal courts apply Maryland law, clear violation of a public policy set forth in a federal regulation may be sufficient to pass the *Adler* test. Even without a full-blown study of the Code of Federal Regulations, I am confident that federal agencies, which Congress relies on to issue rules pursuant to statutes governing major policy matters, have issued regulations sufficiently important to our safety, health and welfare that they constitute a clear mandate of public policy.

Indeed, Parks's claim that Alpharma violated the FDA labeling requirements comes closer to a legitimate claim than Adler's did. One of the reasons we rejected Adler's claim was that "Adler's complaint does not assert that the falsification of corporate records was done with an intent to defraud either stockholders or the public at large by enhancing or depressing the market value of the Corporation's shares or other obligations." *Adler v. Am. Standard Corp.*, 291 Md. 31, 44, 432 A.2d 464, 471 (1981). In contrast, Parks complained about a practice that could potentially impact public health. Ultimately, however, Parks's claim does not quite make the grade because the meaning of the term "clinically significant hazard," which is the measure of what triggers a warning requirement under 21 C.F.R. § 201.57(c)(6)(i), simply is not sufficiently clear to meet the *Adler* standard. The term is variable and

subject to many different interpretations. In *Adler* and its progeny, Maryland has adopted a more conservative view of what is actionable, not wishing to involve the courts in border-line claims where the violation of public policy is not so clear.

For the aforementioned reasons, I join in the majority's judgment only.