*Yuan v. Johns Hopkins Univ.*, No. 35, September Term, 2016. Opinion by Greene, J.

**LABOR & EMPLOYMENT—WRONGFUL TERMINATION—RESEARCH MISCONDUCT**

Under Maryland law, an at-will employment contract may be legally terminated by either party at any time. There exists a public policy exception to the at-will employment rule for wrongful termination "when the motivation for the discharge contravenes some clear mandate of public policy[.]" *Adler v. Am. Standard Corp.*, 291 Md. 31, 47, 432 A.2d 464, 473 (1981). Limitations to this public policy exception include that the policy relied on by the terminated employee should be clearly discernible and that the policy should not otherwise provide a legal remedy, such as damages, to the employee.

Petitioner, Daniel S. Yuan, M.D. ("Dr. Yuan"), alleged he was terminated for reporting research misconduct, in violation of 42 U.S.C. § 289b and 42 C.F.R. Part 93, in a federally funded project by researchers at Respondent institution, Johns Hopkins University School of Medicine ("JHU"). We hold that we do not recognize the federal regulations prohibiting research misconduct as a clear public policy to support a tort claim for wrongful termination of employment. The federal regulations outline a self-regulation policy which directs the federally funded institutions to ensure research misconduct does not take place through an internal procedure established by the institution. The institutions are required to provide procedures to investigate misconduct, take appropriate action, and address retaliation. *See* 42 C.F.R. §§ 93.300–93.304. The scientific institution, not this Court, is in the best position and has the expertise to determine whether the research results of its employees amounted to impermissible research misconduct or permissible error or differences of opinion. Dr. Yuan did not follow the protocol outlined in JHU's policies for such claims. Under the circumstances presented in the case at bar, there was no clear violation of the research misconduct regulations to warrant a cause of action for wrongful termination.

Furthermore, Dr. Yuan notes that the federal regulations do not provide him a legal remedy in the form of damages and that by allowing a wrongful termination claim based on a public policy against research misconduct we would be granting such a remedy to employees. However, because the public policy he is alleging is not clearly discernible, as we cannot determine if a research misconduct violation occurred, we do not recognize the policy to establish his claim for wrongful termination. Thus, Dr. Yuan's at-will employment simply ended due to the expiration of his employment contract.

**TORTS—CONVERSION—OWNERSHIP**

Finally, Dr. Yuan claims that JHU violated its own policy when he was first told that he could have access to the research materials he collected, but was later denied such access. Here, we hold, as a matter of law, that JHU owned the frozen cells generated while Dr. Yuan was employed by JHU according to JHU's guidelines regarding ownership of research materials. Thus, it was proper for JHU to prevent Dr. Yuan's access to such materials. Accordingly, we affirm the judgment of the Court of Special Appeals.

Circuit Court for Baltimore City
Case No. 24-C-13-8243
Argued: December 6, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 35

September Term, 2016

_____

DANIEL S. YUAN

v.

JOHNS HOPKINS UNIVERSITY

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Hotten,
Getty,
Raker, Irma S., (Senior Judge, Specially
Assigned),

JJ.

_____

Opinion by Greene, J.

_____

Filed: March 29, 2017

In this case, Petitioner, Daniel S. Yuan, M.D. ("Dr. Yuan"), challenges the Court of Special Appeals' conclusion that there was no clear public policy mandate to support a claim for wrongful termination for reporting research misconduct in a federally funded project at Respondent institution Johns Hopkins University School of Medicine ("JHU"), a scientific research institution. Dr. Yuan was a researcher employed by JHU. The suit arises from Dr. Yuan's allegation that he was wrongfully terminated in retaliation for his repeated protests of research misconduct in violation of 42 U.S.C. § 289b and 42 C.F.R. Part 93.[1]

We hold that these provisions regarding research misconduct do not provide a clear public policy to support a tort claim for wrongful termination of employment. The self-regulating provisions direct the federally funded scientific institutions to provide procedures to investigate allegations of research misconduct, take appropriate action, and address retaliation. *See* 42 C.F.R. §§ 93.300–93.304. The scientific institution, not this

---

[1] 42 U.S.C. § 289b requires the Secretary of Health and Human Services to promulgate regulations to define and prevent "research misconduct" and protect whistleblowers from retaliation. 42 C.F.R. Part 93 indicates that federally funded, scientific institutions must have procedures in place to detect and prevent research misconduct and prevent retaliation against whistleblowers. Research misconduct is defined as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." 42 C.F.R. § 93.103.

> (a) Fabrication is making up data or results and recording or reporting them.
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
> (d) Research misconduct does not include honest error or differences of opinion.

*Id.*

Court, is in the best position and has the expertise to determine whether the research results of its employees amounted to impermissible research misconduct or permissible error or differences of opinion. Dr. Yuan did not follow the protocol outlined in JHU's policies for research misconduct claims. Further, Dr. Yuan acknowledged in his brief filed in this case that the regulations do not provide him with legal redress in the form of damages and he therefore seeks tort damages based on a theory of wrongful termination. However, there was no clear violation of the research misconduct regulations to warrant a cause of action for wrongful termination.

Dr. Yuan also alleged conversion because after the termination of his employment, he was denied access to stored research materials he had collected. However, JHU owned the research materials pursuant to its policy, and it is well settled that a party may not convert that which it owns. Therefore, we affirm the judgment of the Court of Special Appeals.

**FACTUAL AND PROCEDURAL BACKGROUND**

Dr. Yuan alleged in a lengthy amended complaint the following facts:

Dr. Yuan was Board-certified in General Pediatrics and Pediatric Gastroenterology. He was employed by JHU as a researcher with the Pediatrics Faculty. In July 2001, he joined the lab of Dr. Jef Boeke ("Dr. Boeke"), a Professor in the Department of Molecular Biology and Genetics and the head of a yeast genetics lab. The lab was largely funded through the National Institute of Health ("NIH"), an agency of the United States Department of Health and Human Services ("DHHS"). Between February 2002 and June 2011, the NIH provided over $11.8 million to the lab for research on the Synthetic Lethality

2

Analyzed by Microarray ("SLAM") project, which was an ambitious yeast genetics research project using a novel methodology, as well as a $34 million grant for a project related to the SLAM research. In Dr. Boeke's lab, Dr. Yuan was initially responsible for developing the computational infrastructure to manage the SLAM project's massive datasets.

When SLAM entered its Production phase, in 2004, Dr. Yuan discovered and reported to the Production team a concern that contaminating traces of DNA from preceding SLAM experiments had led to false positive results. However, the team resisted his concerns and suggestions for addressing the issue and instead began withholding data files from him.

Dr. Yuan stated that from 2005 through 2011, he repeatedly reported research misconduct concerning the yeast genetics research claiming that the SLAM researchers were falsifying the results. In particular, on November 28, 2005, Dr. Yuan emailed Dr. Boeke about issues he identified in research completed by Xuewen Pan ("Dr. Pan"), a post-doctoral fellow in Dr. Boeke's lab. Dr. Yuan stated that Dr. Pan's "genes are preselected," and that continuing with those research projects "will only generate more useless data." He also stated that the SLAM team had already established that "most of the [SLAM Project] hits being identified are bogus."

Dr. Pan's research was published in a biomedical journal, *Cell*, with Dr. Boeke as the senior author in early 2006. Moreover, Dr. Boeke cited Dr. Pan's research when he applied for grant renewals through the NIH. After the NIH renewed the SLAM project funding in late 2006, Dr. Boeke issued a new organizational chart which had the effect of

3

excluding Dr. Yuan from extensive involvement with the SLAM research. Dr. Yuan maintained that he protested his lack of a definite professional role in the SLAM Project and found himself increasingly marginalized and excluded from the data management.

Between 2006 and 2008, the SLAM research was unsuccessful; the lab did not have significant results to report to NIH. Dr. Boeke asked other researchers to review the SLAM project data, excluding Dr. Yuan. The researchers corroborated Dr. Yuan's findings and found that the data had an extraordinarily high "False Discovery Rate." In the summer of 2008, Dr. Boeke decided not to renew the NIH grant for SLAM, although, some funding remained available to operate SLAM.

In January 2009, after analyzing Dr. Pan's microarray data from his *Cell* publication, Dr. Yuan determined that Dr. Pan could not have obtained the results he claimed. His conclusion was not that Dr. Pan fabricated the results; instead, Dr. Yuan asserted that Dr. Pan likely conducted the experiment with preconceptions of the results he wanted to find—and then managed to find those results. Dr. Yuan also concluded similarly with respect to a paper published in 2008 by Dr. Yu-yi Lin ("Dr. Lin") in *Genes & Development*. In January of 2009, Dr. Yuan also notified both Dr. Boeke and SLAM's project manager, Dr. Meluh, of the problems with Dr. Pan's 2006 and Dr. Lin's 2008 papers.

Dr. Yuan was informed by Dr. Boeke in December 2009 that Dr. Boeke would not be renewing his faculty contract for 2011, unless he was able to secure self-sustaining funding within the next year. Dr. Boeke explained this was due to limited funding;

4

however, at that time, Dr. Boeke established three new full-time positions with the SLAM Project for three other individuals.

Dr. Yuan again reported problems with SLAM research, in January 2010, at a lab seminar where he identified bizarre zigzag patterns after plotting data for individual genes in SLAM's Production data in chronological order. Dr. Yuan concluded that these zigzags were both non-random and unpredictable and were also large enough to masquerade as the genetic interactions that SLAM was looking for; thus, according to Dr. Yuan, attempts to interpret SLAM's data were doomed to fail. Further, during the last week of the NIH funding of SLAM, on June 29, 2010, Dr. Yuan wrote to Dr. Boeke that after analyzing the production team's last 118 experiments, he found about ten percent had "noise" (bad data) with no apparent cause and only about ten percent "looked pretty good."

In October 2010, two of the grant applications Dr. Yuan sought funding for had failed. Dr. Yuan asserted that Dr. Boeke falsely conveyed to him that there was no available funding to support him. On December 14, 2010, Dr. Carol Greider ("Dr. Greider"), the director of the Department of Molecular Biology and Genetics, offered Dr. Yuan a part-time support staff position for the 2011 year to expire at the end of that year. The salary was $24,800, well below his salary as a researcher. Dr. Yuan accepted the employment contract; however, from January 2011 forward, Dr. Boeke excluded Dr. Yuan from lab activities.

On April 29, 2011, Dr. Lin held a seminar in Dr. Boeke's lab. Dr. Yuan alleged that the data results were inaccurate because when he asked Dr. Lin several questions regarding the research neither Dr. Lin nor Dr. Boeke could provide adequate responses.

5

Further issues arose when on June 29, 2011, Dr. Yuan submitted a publication and listed himself as the sole author. Dr. Boeke asked Dr. Greider to issue a written reprimand to Dr. Yuan for failing to offer Dr. Boeke shared authorship of the published manuscript. Dr. Greider issued a reprimand to Dr. Yuan. This led to Dr. Yuan meeting with Joan Johnson, a human resources representative for JHU School of Medicine, on July 8, 2011, to discuss Dr. Yuan's concerns about Dr. Greider's reprimand. Dr. Yuan also initiated JHU's Grievance Appeals Process. He explained that his employment problems arose over the context of results produced in the lab, and that there was an inexplicable vehemence that Dr. Boeke and Dr. Greider exhibited towards him. JHU denied Dr. Yuan's grievance appeal on December 22, 2011.

Dr. Yuan's employment contract was set to end on December 31, 2011. Prior to his end date, he requested a property pass from Dr. Boeke, which would allow him to move his research collection of archived cells out of the lab. Dr. Boeke refused to provide him the pass until they could come to an understanding of all the issues relating to which files and materials Dr. Yuan could take.

On November 30, 2011, Dr. Yuan requested an affidavit or other confirmation that Dr. Boeke would give Dr. Yuan access to Dr. Yuan's archived cells for five years. According to Dr. Yuan, Dr. Boeke initially accepted this request, but later failed to mention the matter in any correspondence between Dr. Yuan, Dr. Boeke, and JHU. Later, JHU declined to provide such access. On December 15, Dr. Yuan went to JHU to seek access to his materials and was escorted from the workplace by JHU Security Officers.

After Dr. Yuan's employment contract with JHU had expired, in early 2012, a "Letter" (equivalent to a research paper) was published in a scientific research journal, *Nature*, with Dr. Lin and Dr. Boeke named as the authors. After reviewing the publication, Dr. Yuan believed there were serious conceptual errors in the paper. He concluded that the underlying data was not reproducible. Dr. Yuan's counsel, on May 14, 2012, told Ronald J. Daniels, the president of JHU, and Edward D. Miller, the president of the School of Medicine, about these "serious scientific problems" in the publication. Patricia L. McClean, JHU senior associate general counsel, responded on May 21, 2012 stating that, "[t]he School of Medicine is looking into the allegations of research misconduct made in your letter under its Procedures for Dealing with Issues of Research Misconduct." No one from JHU, however, sought further information from Dr. Yuan nor contacted him regarding the *Nature* paper.

On July 24, 2012, Dr. Yuan submitted a "rebuttal analysis" to Dr. Lin and Dr. Boeke about the *Nature* article for submission to *Nature*. Dr. Yuan requested that both Dr. Lin and Dr. Boeke respond. A response was due on August 7, 2012. Neither doctor responded. On August 8, 2012, someone emailed Dr. Yuan, using Dr. Lin's account stating, "Dr. Yuan, Yu-yi [Dr. Lin] passed away this morning. Now you must be very satisfied with your success. Congratulations[.]" The death appeared to be a suicide as news accounts in Taiwanese media made clear that Dr. Lin had died in his lab from a self-administered overdose of sedatives. Moreover, the media reported he had attempted to jump off a building the previous evening. His wife stated that Dr. Lin was concerned about a "conduct-of-research" case and had trouble sleeping from the pressure.

7

Dr. Yuan received an email from Dr. Boeke on February 11, 2013, asking if he would sign a "correction" that was prepared for the 2006 *Cell* paper. "The gist of the correction was that the fraction of genetic interactions that could be traced back to the paper's SLAM-based microarray data was 75[%], not 90[%] as originally stated." Dr. Yuan responded to Dr. Boeke that he would not sign a correction, but Dr. Boeke still submitted them to *Cell*, which published it as an "Erratum" on May 23, 2013. On November 6, 2013, the *Nature* paper was also retracted. There was no "correction." Dr. Boeke admitted that "the Methods section in our Letter is inaccurate, and that for 38% of the interactions found by the primary screen there was discordance in sign," which was consistent with Dr. Yuan's findings. Dr. Yuan implies that this acknowledgment of incorrect data indicates that research misconduct occurred.

On December 13, 2013, Dr. Yuan filed, in the Circuit Court for Baltimore City, a complaint for damages against JHU. He alleged wrongful termination in violation of public policy. Dr. Yuan based this wrongful discharge action on 42 C.F.R. §§ 93.100–93.104, which provides that DHHS, including NIH, must investigate and punish intentional, knowing, or reckless "research misconduct" that represents "a significant departure from accepted practices of the relevant research community." The regulations direct the federally funded institutions to provide procedures to investigate misconduct, take appropriate action, and address retaliation. *See* 42 C.F.R. §§ 93.300–93.304. "Research misconduct means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." 42 C.F.R. § 93.103. Dr. Yuan also brought claims for conversion and tortious interference with prospective

8

economic advantage. JHU filed a motion to dismiss or, in the alternative, for summary judgment and a request for a hearing. On May 12, 2014, the Circuit Court held a hearing and granted JHU's motion to dismiss because Dr. Yuan failed to identify a public policy exception to the at-will employment doctrine. Judge Lawrence Fletcher-Hill, for the Circuit Court, explained:

> There certainly are ample allegations that Dr. Yuan raised and continued to raise issues within his lab with Dr. Boeke and with others about the conclusion being reached by the research, [and] the manner in which the research was conducted. But the allegations very carefully skirt the line of fraud, falsification of data or manipulation of data. And it is a good illustration of why this tort needs to be drawn narrowly [so] that it does not amount to the opportunity for courts to litigate debates, intellectual debates within the scientific community about methodology or research methods or conclusions. Based on the allegations, even giving them full credit, until after Dr. Yuan was fired, his objections amounted to those types of intellectual debates and challenges within the lab. . . . "[W]hile there's not [sic] question that academic integrity and research integrity is an important value, I conclude that it does not rise to the level that the Court of Appeals would recognize as the clear public policy necessary to support [a] cause of action for the tort of wrongful discharge in Maryland.

The Circuit Court also rejected the conversion claim:

> [A]lthough it may be that there is a policy at Johns Hopkins University to on a case-by-case basis allow research material or research data to be released for the individual or non-Hopkins use by researchers who have developed it at Hopkins, the basic policy, which is clearly stated and has not been challenged here, is that Hopkins asserts its ownership of all research material and all research data that has been developed within labs of the University. . . . Hopkins could not have converted what it in fact had ownership of.

Dr. Yuan filed a timely notice of appeal from the judgment of the Circuit Court. The Court of Special Appeals affirmed. *Yuan v. Johns Hopkins Univ.*, 227 Md. App. 554, 135 A.3d 519 (2016). The intermediate appellate court concluded:

9

[T]hat the broad language and complex nature of these federal provisions, their deference to institutions, such as Hopkins, for the prevention and detection of research misconduct, and the difficult line they draw between scientific errors and wrongdoing and between falsity and fraud, make this a poor State public policy vehicle to carry a wrongful discharge action. Because the Circuit Court for Baltimore City did not err in rejecting this claim and others advanced by Yuan, we affirm.

*Yuan*, 227 Md. App. at 558, 135 A.3d at 522.

Dr. Yuan filed a petition for writ of certiorari in this Court. We granted the Petition for Certiorari to answer the following questions:

1. Did the Court of Special Appeals err in precluding Md. employees from bringing wrongful termination claims based on retaliation for reporting research misconduct, by refusing to recognize the federal law prohibiting research misconduct as a public policy basis, contrary to this Court's recognition of wrongful termination claims?
2. Did the Court of Special Appeals err in precluding Md. employees from bringing conversion claims based on the employer's conversion of the employee's personal research materials, by improperly drawing inferences in favor of Respondent when it interpreted Respondent's research materials policy?

*Yuan v. Johns Hopkins Univ.*, 449 Md. 412, 144 A.3d 706 (2016).

For the reasons stated below, we affirm the judgment of the Court of Special Appeals. We hold that the provisions regarding research misconduct do not provide a clear public policy to support a tort claim for wrongful termination of employment. The self-regulating provisions direct the federally funded scientific institutions to provide procedures to investigate allegations of research misconduct, take appropriate action, and address retaliation. Dr. Yuan did not follow the protocols outlined in JHU's policies for such claims. Although Dr. Yuan is correct that the federal regulations do not provide him a legal remedy and damages because the public policy he is alleging is not clearly

10

discernible, there is no basis to support a claim for wrongful termination and tort damages. Dr. Yuan was not wrongfully terminated and his at-will employment came to an end due to the expiration of his employment contract. Moreover, Dr. Yuan's allegation of conversion must fail because JHU owned the research materials pursuant to its stated policies. Accordingly, JHU, as a matter of law, cannot convert property that it already owns.

## STANDARD OF REVIEW

In reviewing a motion to dismiss this Court has stated:

> On appeal from a dismissal for failure to state a claim, we must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. We must confine our review of the universe of "facts" pertinent to the court's analysis of the motion to the four corners of the complaint and its incorporated supporting exhibits, if any. The well-pleaded facts setting forth the cause of action must be pleaded with sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice. Our goal, in reviewing the trial court's grant of dismissal, is to determine whether the court was legally correct.

*Parks v. Alpharma, Inc.*, 421 Md. 59, 72, 25 A.3d 200, 207 (2011) (citations and internal quotation marks omitted).

Moreover, the interpretation of a statute or regulation requires reviewing the decision of the Circuit Court *de novo*. *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 181, 909 A.2d 694, 699 (2006) ("The resolution of these issues [by the Court] requires statutory interpretation. Interpretation of a statute is a question of law, and, therefore, we review the decision of the Circuit Court *de novo*.").

11

## DISCUSSION

### Parties' Contentions

Dr. Yuan contends this Court should hold that the Court of Special Appeals erred in upholding the Circuit Court's dismissal of Dr. Yuan's claim for wrongful termination in violation of public policy, when both courts below refused to recognize the federal statutes and regulations, 42 U.S.C. § 289b and 42 C.F.R. Part 93, that prohibit research misconduct as sources of public policy. Further, according to Dr. Yuan, the intermediate appellate court erred in upholding the Circuit Court's dismissal of his conversion claim. Dr. Yuan states either (a) JHU's policy expressly recognizes his entitlement to possession of the research cell lines he created, or, in the alternative, (b) JHU's policy is ambiguous on Dr. Yuan's entitlement to those cell lines and further discovery is thus necessary.

JHU, however, contends Dr. Yuan's claim for wrongful termination fails because the regulations related to research misconduct are too vague and variable to give rise to a clear public policy of Maryland supporting a claim for wrongful termination under the circumstances. According to JHU, sound public policy should promote debate among researchers, protecting this process from the specter of jury adjudication and damages, rather than impose a wrongful discharge penalty for unfettered discussion. In addition, JHU maintains that Dr. Yuan does not own the materials which he claims JHU took from him and, as a matter of law, JHU cannot convert what it already owns.

### Wrongful Termination Claims Based on Public Policy of Retaliation for Reporting Research Misconduct

"The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler v. Am. Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). "The doctrine was born during a laissez-faire period in our country's history, when personal freedom to contract or to engage in a business enterprise was considered to be of primary importance." *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069, 1073 (1991). However, there are limitations to the at-will employment doctrine. This Court has recognized the competing interests in at-will employment including the employer's interest in terminating an employee without reason and an employee's and society's interest in ensuring employees are not terminated in violation of public policies. *Adler*, 291 Md. at 42, 432 A.2d at 470. According to Maryland law, there is a public policy exception to the at-will employment rule for wrongful termination "when the motivation for the discharge contravenes some clear mandate of public policy[.]" *Adler*, 291 Md. at 47, 432 A.2d at 473.

> [F]ew courts have flatly rejected the notion that the wrongful discharge of an at will employee may give rise to a cause of action for damages. Where courts differ is in determining where the line is to be drawn that separates a wrongful from a legally permissible discharge. This determination depends in large part on whether the public policy allegedly violated is sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.

*Adler*, 291 Md. at 42, 432 A.2d at 470–71.

For an at-will employee to establish wrongful termination "the employee must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the

13

employer's decision to fire the employee." *Wholey v. Sears Roebuck*, 370 Md. 38, 50–51, 803 A.2d 482, 489 (2002) (citations omitted). This Court held:

> 'The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions, be the public policy of another.'

*Adler*, 291 Md. at 46, 432 A.2d at 472 (quoting *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930)). Courts may rely on "prior judicial opinions, legislative enactments, or administrative regulations" as the chief sources of public policy and the "declaration of public policy is normally the function of the legislative branch." *Adler*, 291 Md. at 45, 432 A.2d at 472. We have recognized that the tort of wrongful discharge is decided on a case-by-case basis. *Id.* ("We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch.").

An employee fired for retaliation for reporting a violation of a state or federal law is alone insufficient to establish a valid wrongful discharge claim based on public policy. This Court adopted the reasoning of *Szaller v. American Nat'l Red Cross*, 293 F.3d 148 (4th Cir. 2002), in *Parks v. Alpharma, Inc.*, 421 Md. 59, 25 A.3d 200 (2011) (holding that the FDA's regulations which an employee reported that the employer allegedly violated was not sufficiently clear to provide the basis for her wrongful discharge claim). *See also Adler*, 291 Md. at 43, 432 A.2d at 471 (holding that Maryland's corporate fraud law did

14

not clearly explain what the employer was legally bound to perform, or refrain from performing; thus, the employee's complaint that he had been retaliated against for reporting employer's fraud did not raise a clear wrongful discharge action). This Court stated:

> If a court were to announce that the FDA's regulations were all sources of Maryland public policy, an employee could immunize himself against adverse employment action *simply by reporting an alleged violation of any regulation*. And the narrow wrongful discharge exception, carefully carved out by the Maryland courts, would then supplant the general at will employment rule.

*Parks*, 421 Md. at 86–87, 25 A.3d at 216 (emphasis added) (citations and internal quotation marks omitted).

This Court, in *Parks*, set forth "limitations on a court's ability to articulate a new public policy mandate" to establish wrongful termination. *Parks*, 421 Md. at 79, 25 A.3d at 212. A court must look to the "accepted purpose behind recognizing the tort in the first place: to provide a remedy for an otherwise unremedied violation of policy." *Id.* (internal quotation marks omitted). Also, the policy at issue "should be reasonably discernible from prescribed constitutional or statutory mandates." *Id.* (internal quotation marks omitted). *See also Wholey*, 370 Md. at 52–54, 803 A.2d at 490–91 ("The first limiting factor with respect to adopting a 'new' public policy mandate for a wrongful discharge claim is derived from the generally accepted purpose behind recognizing the tort in the first place: to provide a remedy for an otherwise unremedied violation of public policy. . . . A second limiting factor in defining a public policy mandate as a cause of action in tort is the notion that the policies should be reasonably discernible from prescribed constitutional or statutory mandates.").

For the first limiting factor, in *Makovi v. Sherwin–Williams Co.*, the Court noted that "the generally accepted reason for recognizing the tort" of wrongful discharge is "vindicating an otherwise civilly unremedied public policy violation." *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 626, 561 A.2d 179, 189 (1989). On the other hand, where a statute already has its own remedy, "allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon." *Id.* In the case at bar, Dr. Yuan has noted that the federal regulations do not authorize damages against JHU and he therefore seeks tort damages based on a theory of wrongful termination. Under the circumstances, however, there was no clear violation of the research misconduct regulations to warrant a cause of action for wrongful termination. There is no clearly discernible public policy to support Dr. Yuan's claim of wrongful termination.

Even where there is an unremedied violation of public policy, the second limitation is that the subject policy must "be reasonably discernible from prescribed constitutional or statutory mandates." *Wholey*, 370 Md. at 53, 803 A.2d at 491 (citations omitted). The Court of Special Appeals and the Circuit Court, in the case at bar, relied on *Parks*, as controlling this determination. The Court of Special Appeals noted that in *Parks*, this Court held that overly broad federal regulations could not form the basis for a wrongful discharge claim; specificity is important when relying on a statute or regulation. Moreover, although accepting as a general matter that federal laws and regulations could form the basis for a wrongful termination claim in Maryland, the *Parks* Court determined that the Federal Trade Commission (FTC) and Federal Drug Administration (FDA) regulations lacked "the

16

specificity of public policy that we have required to support a wrongful discharge claim."

*Parks*, 421 Md. at 83, 86, 25 A.3d at 202–03, 215 ("The regulation at issue provides the FDA's standard for what details must be included on a prescription drug label if there is 'reasonable evidence' that a particular drug has a 'clinically significant hazard.' What is not clear from the regulation is the specific public policy mandate that [the employer] Alpharma allegedly violated to support the instant wrongful discharge claim").

To be specific, *Parks* involved a FDA regulation (21 C.F.R. § 201.57(c)(6)(i)) which provided that pharmaceutical companies must label drugs to notify customers of any "clinically significant hazard." 421 Md. at 70, 25 A.3d at 206. The employee, Parks, was allegedly fired for reporting her employer's, Alpharma's, violation of the regulation. *Id.* However, this Court refused to recognize the FDA regulation as a source of Maryland public policy for which an employee could base its wrongful termination suit. We stated:

> The regulation at issue provides the FDA's standard for what details must be included on a prescription drug label if there is 'reasonable evidence' that a particular drug has a 'clinically significant hazard.' What is not clear from the regulation is the specific public policy mandate that Alpharma allegedly violated to support the instant wrongful discharge claim. Under such circumstances, we are left with only our own discernment to determine whether the behavior Ms. [Parks] alleges constituted non-compliance by Alpharma, a judgment we abjure, absent a clear, unmistakable signal in the law. . . . [I]f we were to recognize a mandate in the FDA's labeling standard, we are at a loss for articulating precisely what the contours of that mandate would be. For all of the reasons stated, we conclude that Ms. Parks has failed to state a claim upon which relief can be granted for wrongful discharge, and therefore, affirm the decision of the Circuit Court. The public policy that Ms. Parks alleged Alpharma violated was not sufficiently clear to provide the basis for her wrongful discharge claim.

*Parks*, 421 Md. at 86–87, 25 A.3d at 215–16.

17

The circumstances in *Parks* are similar to those in the case at bar. Pursuant to the federal regulations, 42 C.F.R. § 93.104, researchers can be found to have engaged in research misconduct when they violate scientific research norms. However, a violation of the scientific norms is not a sufficiently clear public policy to serve as the basis for a claim of wrongful discharge. 42 C.F.R. § 93.104. *See also U.S. ex rel. Milam v. Regents of Univ. of Cal.*, 912 F. Supp. 868, 889 (D. Md. 1995) ("The Court finds that it would be an unconscionable intrusion of law into academia to force a jury to decide whether [researchers] should have informed NIH of [non-supportive] results sooner than [they did]."). Not unlike in *Parks*, where the determination of a violation of the regulations was vested with federal agencies, here, the self-regulating provisions contained in the federal regulations direct the federally funded institutions to address allegations of research misconduct, to determine if research misconduct took place, and to address retaliation and whistleblower claims. The scientific institution, not this Court, is in the best position and has the expertise to determine whether the research results of its employees amounted to impermissible research misconduct or permissible error or differences of opinion. As we stated in *Parks*, the research misconduct regulations lack specificity as to what constitutes a violation and thus we are at a loss to determine what the contours of a wrongful termination claim based on reporting research misconduct would be. We hold that these provisions regarding research misconduct do not provide a clear public policy to support a tort claim for wrongful termination of employment.

Both 42 U.S.C. § 289b and the regulations of 42 C.F.R. Part 93 indicate that federally funded scientific institutions are in place to detect and prevent research

18

misconduct that involves Public Health Service ("PHS") funding. 42 U.S.C. § 289b requires the Secretary of Health and Human Services to promulgate regulations to define and prevent "research misconduct" and protect whistleblowers from retaliation. The regulations adopted by the Secretary of Health and Human Services declare, relevant to the case at bar, "research misconduct" is defined as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." 42 C.F.R. § 93.103.

> (a) Fabrication is making up data or results and recording or reporting them.
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
> (d) Research misconduct does not include honest error or differences of opinion.

*Id.* The regulation notes that errors or differences of opinion do not constitute research misconduct. 42 C.F.R. 93.103(d). Similar to the facts in *Parks*, the regulations are not sufficiently clear and specific for a court to determine whether research misconduct occurred. To show that there was a violation of the regulations, Dr. Yuan indicates that the results were falsified because Dr. Boeke issued a correction to the 2006 Lin paper (stating 75%, instead of 90%, of the reported genetic interactions were supported by the data) and he retracted the 2008 Pan paper. Simply because the researchers were incorrect or erroneous in their findings does not equate to falsifying or fabricating evidence. Thus, such determinations are best made by the institution receiving the federal funding and not by a court. In the case at bar, we can only determine that there was no clear violation of

19

the research misconduct regulations to warrant a cause of action for wrongful termination. Moreover, before a finding of research misconduct can be made, federal regulations require that:

> (a) There be a significant departure from accepted practices of the relevant research community; and
> (b) The misconduct be committed intentionally, knowingly, or recklessly; and
> (c) The allegation be proven by a preponderance of the evidence.

42 C.F.R. § 93.104. Institutions which receive federal funds have the primary duty to report and respond to such research misconduct. 42 C.F.R. § 93.300(b), (d) ("Institutions under this part must . . . (b) Respond to each allegation of research misconduct for which the institution is responsible under this part in a thorough, competent, objective and fair manner, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional or financial conflicts of interest with the complainant, respondent or witnesses . . . (d) Take all reasonable and practical steps to protect the positions and reputations of good faith complainants, witnesses and committee members and protect them from retaliation by respondents and other institutional members"). The institutions are best situated and have the expertise to address the allegations of research misconduct through self-enforcement. Further, these self-regulating provisions direct federally funded institutions to provide procedures to investigate misconduct, take appropriate action, and address retaliation. *See* 42 C.F.R. §§ 93.300–93.304.

> [R]esearch institutions are left to set their own policies for, and conduct their own investigations of, the wide-ranging category of 'questionable research practices' and all cases of negligent misconduct. This deference to self-enforcement, embedded in the federal definition of research misconduct, is a

20

defining trait of the oversight scheme for federally funded research generally[.]

Patrick O'Leary, *Policing Research Misconduct*, 25 ALB. L.J. SCI. & TECH. 39, 50 (2015) (footnotes omitted). "As for defining research misconduct as a significant departure from accepted practices of the relevant research community, this presents both difficult line drawing problems and . . . the possibility of holding similarly situated individuals to disparate standards." 25 ALB. L.J. SCI. & TECH. at 79. O'Leary observes that the problem with resolving research misconduct allegations through the judiciary, "whether through civil litigation or criminal prosecutions, is that determinations of misconduct in this area frequently require a sophisticated understanding of scientific methods and principles that courts and juries rarely possess and are often badly positioned to obtain, even with assistance from expert witnesses." 25 ALB. L.J. SCI. & TECH. at 71. Thus, we cannot say that the public policy allegedly violated by JHU is sufficiently clear to provide the basis for Dr. Yuan's wrongful discharge claim and JHU appears to be in a much better position to address research misconduct, consistent with its internal policies.

In fact, JHU had such procedures in place as reflected in its "Procedures for Dealing with Issues of Research Misconduct" document. *See* 42 C.F.R. § 93.300(d) and JHU Research Misconduct Procedures at Section II. JHU's Procedures for Dealing with Issues of Research Misconduct provide that an employee who "suspects that research misconduct has occurred has an obligation to report that suspicion to the director of the department or division affected, or to the Dean of the School of Medicine." Dr. Yuan did not report that he believed he was fired in retaliation for reporting alleged research misconduct according

21

to the procedures in place. He directed his complaints about the SLAM data and experiments to other researchers in the lab in which he and Dr. Boeke worked. Dr. Boeke, a professor in the Department of Molecular Biology and Genetics and the head of a yeast genetics lab, and the other researchers were the same individuals who Dr. Yuan accused of the misconduct and did not fall into the category of the Dean of the School of Medicine or directors of the department affected. Furthermore, Dr. Greider was the director of the Department of Molecular Biology and Genetics. Dr. Yuan, however, does not state in his complaint that he reported allegations of research misconduct to her. Moreover, wrongful discharge requires termination by the employer. Here, Dr. Yuan's employment contract simply expired; he was not wrongfully terminated in violation of a clear and specific public policy.

Furthermore, Congress has explicitly vested broad authority in the scientific institutions to determine how to address retaliation and whistleblowers. The Secretary of HHS even proposed regulations which would allow relief to whistleblowers and would require a federally funded organization to deal with these retaliation claims by providing an administrative hearing where they could recover money damages. Public Health Service Standards for the Protection of Research Misconduct Whistleblowers, 65 Fed. Reg. 70,830, 70,839 at § 94.445 (proposed Nov. 28, 2000) (to be codified at 42 C.F.R. pt. 94). However, these regulations were not adopted and were, in fact, withdrawn. OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, RIN: 0937-AA03, PUBLIC HEALTH SERVICE STANDARDS FOR THE PROTECTION OF RESEARCH MISCONDUCT WHISTLEBLOWERS (2011). Thus, the federal research misconduct scheme does not create a legal remedy,

22

granting employees damages, for retaliation for reporting research misconduct. Therefore, it would be inappropriate for this Court to step in and recognize a public policy against research misconduct in order to grant tort damages to complaining employees. In view of the research misconduct regulatory scheme, as O'Leary observes, the federal regulations show "a long tradition of government deference to the norms and integrity of the academy," 25 ALB. L.J. SCI. & TECH. at 90, and a "deferential attitude favoring scientific self-regulation of research," 25 ALB. L.J. SCI. & TECH. at 72. As the Court of Specials pointed out "[a] broader remedy, such as damages, for research misconduct would invite judicial intrusion into the norms of the academy. [Accordingly, t]his may be one reason why Congress did not expressly create a damage remedy for research misconduct." 227 Md. App. at 576, 135 A.3d at 532 (citation omitted).

The case *sub judice* is distinguishable from cases where this Court has recognized the tort of wrongful termination because in those cases the public policy was sufficiently clear to establish the basis for the employee's wrongful discharge claim.

We have recognized a wrongful termination claim where an employee refuses to engage in unlawful conduct and is terminated as a result. *See Insignia Residential Corp. v. Ashton*, 359 Md. 560, 573, 755 A.2d 1080, 1087 (2000) (holding that the employee's termination because she refused sexual advances from her employer violated a clear public policy against prostitution).

> The statute precluding prostitution and attempts to induce or coerce women and men into engaging in prostitution represents a clear mandate of public policy that is violated when an at-will employee is discharged for refusing to engage in conduct that would constitute prostitution (or lewdness or assignation, which is also prohibited by § 15 of Article 27). The fact that

23

> both the inducements themselves and a discharge for rejecting them may constitute a violation of the Federal and State employment discrimination laws does not require that we ignore that such conduct also violates the entirely separate, independently based, public policy embodied in § 15.

*Ashton*, 359 Md. at 573, 755 A.2d at 1087. *See also Magee v. DanSources Tech. Servs., Inc.*, 137 Md. App. 527, 573, 769 A.2d 231, 258 (2001) (holding that an employee sufficiently alleged a claim for wrongful discharge under Maryland public policy when she provided evidence that she was fired for refusing to commit health care fraud in violation of federal criminal law). In the case at bar, Dr. Yuan was not terminated for refusing to engage in clearly unlawful conduct. Dr. Yuan merely alleges that he complained about incorrect research results which he believed amounted to research misconduct and was terminated as a result of his complaints. Whether or not there was research misconduct is not a question to be determined by the courts. That determination is left to the sound discretion of the research entities involved.

The Court of Special Appeals has also recognized the tort of wrongful termination when an employee was fired for performing affirmative legal duties that the employee was required to perform by law. *Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md. App. 123, 140, 632 A.2d 463, 471 (1993) (holding that employee teacher had a duty under the law to report matters involving abuse of children, but was wrongfully terminated when she reported suspected abuse). In contrast, JHU, a federally funded institution, is responsible, under federal regulations, for conducting an investigation of research misconduct after Dr. Yuan, the employee, brought his allegations to JHU's attention in accordance with their policies. 42 C.F.R. § 93.300 ("Institutions under this part must . . .

24

(b) Respond to each allegation of research misconduct for which the institution is responsible under this part in a thorough, competent, objective and fair manner, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional or financial conflicts of interest with the complainant, respondent or witnesses[.]").  As we have discussed, Dr. Yuan did not follow the procedures outlined by JHU.  It was not until May 14, 2012, after his employment contract had expired, that Dr. Yuan informed Ronald J. Daniels, the president of JHU, and Edward D. Miller, the president of the School of Medicine, about these "serious scientific problems" in the publication.  Patricia L. McClean, JHU senior associate general counsel, responded on May 21, 2012 stating that, "[t]he School of Medicine is looking into the allegations of research misconduct made in your letter under its Procedures for Dealing with Issues of Research Misconduct."  However, JHU did not contact him further nor did they find that research misconduct had taken place.  Determining if research misconduct took place is an internal process for JHU to determine with its scientific expertise and in accordance with self-regulation as directed by Congress.  Under the circumstances, we can only determine that there was no clear violation of the research misconduct regulations to warrant a cause of action for wrongful termination.

This Court has also recognized the tort of wrongful termination based on public policy when an employee is discharged for exercising his or her legal rights.  *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 481–83, 588 A.2d 760, 767 (1991) (holding that a wrongful termination claim existed when plaintiff was fired for suing a coworker for assault and battery).  We stated, "where, as here, a retaliatory discharge is in response to

25

an [employee] seeking legal redress against a co-worker because of sexual harassment which does amount to assault and battery, *Adler's* requirement of a clear mandate of public policy is satisfied." *Id.* *See also Ewing v. Koppers Co.*, 312 Md. 45, 50, 537 A.2d 1173, 1175 (1988) ("Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy. The Legislature has made a strong statement to that effect in making such conduct a criminal offense, and our perception of the magnitude of the public interest in preserving the full benefits of the worker's compensation system to employees, and deterring employers from encroaching upon those rights, is equally strong.").

In *Watson*, this Court held that the interest in preserving bodily integrity was a sufficiently clear public policy basis to raise a claim of wrongful termination for employees who reported conduct involving sexual harassment that amounts to assault or battery. *Watson*, 322 Md. at 481, 588 A.2d at 767. We noted that federal and state laws prohibited retaliatory discharge for complaints about sexual harassment in the workplace, however, the laws did not provide for legal redress against sexual harassment that amounted to assault or battery. 322 Md. at 483, 588 A.2d at 768 (holding that the plaintiff employee suffered sexual harassment which amounted to assault or battery by her employer). However, the employee's interest in preserving bodily integrity was reinforced by the state's interest in "preventing breaches of the peace" and "statutory policies intended to assure protection from workplace sexual harassment." 322 Md. at 481, 588 A.2d at 767. Thus, this Court found a wrongful termination claim based on public policy would support the employee's tort damages claim because the public policy was clearly discernable and

26

the violation of the policy was otherwise unremedied.  *Id.*  Such is not the case under Dr.

Yuan's circumstances.  We cannot clearly determine what the contours of a wrongful

termination claim based on a public policy against research misconduct would entail.

We hold that the provisions regarding research misconduct do not provide a clear

public policy to support a tort claim for wrongful termination of employment.

### Conversion and Interpreting Respondent's Research Materials Policy

> Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind.  The physical act can be summarized as any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.  This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits. . . . The gist of a conversion is not the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled.

*Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261–62, 841 A.2d 828,

835–36 (2004) (internal quotation marks and citations omitted).  To establish the element

of intent for conversion, the evidence must show that the defendant possessed an intent

> to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.  The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property.

*Borzym,* 379 Md. at 262–63, 841 A.2d at 836 (internal quotation marks and citations

omitted).

"[A] living cell line is a property interest capable of protection" and as such, there

is "no reason why a cell line should not be considered a chattel capable of being converted."

*United States v. Arora*, 860 F. Supp. 1091, 1099 (D. Md. 1994), *aff'd,* 56 F.3d 62 (4th Cir.

1995) (per curiam). *See also Diamond v. Chakrabarty*, 447 U.S. 303, 310, 100 S. Ct. 2204, 2208, 65 L. Ed. 2d 144, 151 (1980) ("[T]he patentee has produced a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility. His discovery is not nature's handiwork, but his own; accordingly it is patentable subject matter[.]"). Moreover, a researcher has a property right in work he or she has copyrighted. *See, e.g.*, *U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir.), *cert. denied*, 522 U.S. 916, 118 S.Ct. 301, 139 L. Ed. 2d 232 (1997). In the case at bar, Dr. Yuan does not hold a patent, copyright, or other specific intellectual property interest in the research materials under consideration. Therefore, he does not have a property interest in the research materials under such a theory.

Specifically, Dr. Yuan does not challenge the validity of JHU's "Policy on Access and Retention of Research Data and Materials." Instead, he alleges JHU violated its own policy when Dr. Boeke first indicated that Dr. Yuan could have access to the materials, but JHU later denied Dr. Yuan such access. The Policy provides:

> 3. OWNERSHIP OF RESEARCH DATA: The University owns all Research Data generated by research projects conducted at or under the auspices of the Johns Hopkins University regardless of funding source, unless specific terms of sponsorship, other agreements or University policy supersede these rights. This policy does not attempt to determine relative rights of researchers and issues surrounding collaborative efforts such as authorship. . . .
> 5. RIGHTS TO ACCESS: . . . The University will have access to the Research Data as necessary for technology transfer, compliance and other purposes. The University also has the option to take custody of the Research Data as determined by the appropriate University official. Such option will not be invoked without cause and subsequent notification of the Primary Responsible Investigator. . . .
> 6. DESTRUCTION OR REMOVAL: . . . With respect to removal of the Research Data, the university recognizes the importance of Research Data to the future research and career of its faculty. Therefore, should removal of

28

Research Data be approved, for example, because of the transfer of the investigator to another institution, the following requirements apply:
I. Researchers may receive approval to remove original Research Data. The University may retain copies.
II. Research Data generated during the Researcher's employment at the University will be maintained in accordance with Johns Hopkins policy[.]
III. Research Data that are integral to the ongoing research of another Johns Hopkins employee or student will continue to be made available for that purpose.

*Johns Hopkins University Policy On Access And Retention Of Research Data And Materials* (January 2, 2008) [http://perma.cc/476F-Y6G5].

In addition, Dr. Yuan does not dispute that he took possession of research samples prior to his time working in Dr. Boeke's lab. However, he argues that JHU violated its policy because he was originally told by Dr. Boeke that he could take his research materials, but he was later prevented from doing so. JHU policy states researchers "may" receive permission to remove property; however, where that information is "integral" to ongoing research, JHU may retain it. Moreover, the policy stated that JHU "owns all Research Data generated by research projects conducted at or under the auspices of the Johns Hopkins University." Accordingly, all of the research data at issue was generated at JHU while Dr. Yuan was employed by the institution. The Supreme Court of the United States stated long ago:

If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer.

*Solomons v. United States*, 137 U.S. 342, 346, 11 S. Ct. 88, 89, 34 L. Ed. 667, 668 (1890) (holding that the use of employer's property and machinery to devise an internal revenue

29

stamp was part of the duty of the employee and therefore the employer owned the right to use the stamp without compensating the employee). Dr. Yuan's employment involved molecular biology and genetics research for JHU. Further, we have found no law, nor did Dr. Yuan offer any law, to support the proposition that Dr. Yuan was entitled to continue his possession of research materials when his employment ended.

Under the JHU Policy, there is no absolute right of a discharged or former researcher to have access or ownership of the research materials. Rather, JHU maintains ownership, "unless specific terms of sponsorship, other agreements, or University policy supersede" JHU's rights. Notably, Dr. Yuan's complaint seems to indicate that all research data and materials were created during Dr. Yuan's tenure at JHU; thus, their ownership is determined by JHU policy, which provides that research data may remain with JHU. Clearly, one cannot covert property which one owns. *Borzym*, 379 Md. at 261–63, 841 A.2d at 835–36 (discussing case law that defines "conversion" to mean taking another's property); *Interstate Ins. Co. v. Logan*, 205 Md. 583, 588–89, 109 A.2d 904, 907 (1954) ("A 'conversion' is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.").

JHU acted in accordance with its policies when it denied Dr. Yuan's access to the research materials as the institution owned all of the materials at issue.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the Court of Special Appeals.

30

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**